UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOSEPH HERNANDEZ,

Plaintiff,

v.

I.S.U., et al.,

Defendants.

Case No. 21-cv-04368-HSG

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 28, 50

Plaintiff, an incarcerated person housed at Calpatria State Prison, has filed a *pro se* civil rights action regarding events that happened at Pelican Bay State Prison ("PBSP"), where he was previously housed. The operative complaint alleges that PBSP correctional officials Bradbury, Kaufman, and McBride[1] placed Plaintiff in administrative segregation based on evidence that lacked indicia of reliability, in violation of the Due Process Clause; and that PSBP correctional official Lacy refused to conduct an unbiased investigation of Plaintiff's grievance challenging the administrative segregation placement in retaliation for Plaintiff filing a grievance and civil rights action against him. *See generally* Dkt. Nos. 1, 8. Now pending before the Court is Defendants' motion for summary judgment, Dkt. Nos. 28, 50.[2] Plaintiff has filed an opposition, Dkt. No. 54; and Defendants have filed a reply, Dkt. No. 57. For the reasons set forth below, the Court GRANTS Defendants' summary judgment motion. Dkt. No. 28.

//

---

[1] PBSP correctional officer Townsend was also named in the complaint. Dkt. Nos. 1, 8. On August 11, 2023, per Plaintiff's request, the Court dismissed Officer Townsend from this action as Plaintiff had mistakenly named Officer Townsend as a defendant. Dkt. Nos. 36, 41.
[2] On January 6, 2025, pursuant to the Court's November 27, 2024 Order (Dkt. No. 49), Defendants re-noticed the summary judgment motion docketed at Dkt. No. 28. Dkt. No. 50.

United States District Court
Northern District of California

**BACKGROUND**

The following facts are undisputed unless otherwise noted.

During the relevant time period, Plaintiff was housed at Pelican Bay State Prison ("PBSP"), and Defendants held the following positions at PBSP. Defendant Bradbury was chief deputy warden; defendants Lacy and McBride were correctional lieutenants; and defendant Kaufman was a correctional officer. Dkt. No. 1 at 7; Rush Decl., ¶¶ 2-3.

**I.    Confidential Memorandum**

In or around July to August 2017, a confidential memorandum was prepared summarizing a July 2017 interview with a confidential source. This confidential memorandum was submitted to the Court for *in camera* review on August 23, 2023, Dkt. No. 44, and a redacted copy was made available to Plaintiff in or around December 2024, Dkt. No. 49. The Court's description of the contents of the confidential memorandum is based on the Court's review of this document.

The confidential memorandum memorialized an interview between a correctional officer and a confidential source. The confidential memorandum concerned overall prison security and credibly explained that it was generated in response to recent attacks on staff. The confidential source further stated that they believed that an inmate was facilitating communications related to assaulting staff. The description given by the confidential source plausibly implicated Plaintiff as involved in the conspiracy to attack staff. The confidential memorandum represented that the informant had previously provided reliable information, and explained that staff investigated the information provided by the informant and used it to gauge the informant's credibility. The information in the confidential memorandum was consistent with what was later reported to Plaintiff in the Form 1030 and Form 114-D that he received, as described in more detail below.[3]

**II.    Plaintiff's 2017 Civil Rights Action**

On or about July 13, 2017, Plaintiff mailed a civil rights complaint to this Court, alleging that several PBSP correctional officers, including defendant Lacy, had engaged in misconduct unrelated to this case. Defendants Bradbury, McBride, and Kaufman were not named in this

---

[3] Because the confidential memorandum is not a part of the public docket, the Court does not detail the evidence here.

complaint.  *See* C No. 17-cv-4055 HSG, *Hernandez v. Schaad, et al.* ("*Hernandez I*"), Dkt. No. 1 (Jul. 19, 2017).  At that time, the prison was in lockdown, and to mail documents incarcerated persons had to hand their mail to correctional officials.  The cover sheet of Plaintiff's complaint listed all the defendants, including defendant Lacy.  A copy of this cover sheet was attached to Plaintiff's request to proceed *in forma pauperis* in *Hernandez I*.  Both Plaintiff's complaint and *in forma pauperis* application were handed to correctional officials, with the cover sheets visible. Dkt. No. 28-5 at 22-24.

The Court docketed the *Hernandez I* complaint on July 19, 2017, and opened a civil rights action pursuant to this filing.  *Id.*  The Court did not screen the *Hernandez I* complaint until December 29, 2017.  In the screening, the Court dismissed all the named defendants except for PBSP officer Buchanan.  *Hernandez I*, Dkt. No. 6 (Dec. 29, 2017).  The Court only ordered service on officer Buchanan.  *Id.*  Defendant Lacy was never served in *Hernandez I*.

### III.    Placement in Administrative Segregation Unit ("ASU")

On August 5, 2017, Plaintiff was informed by defendant McBride that he was being placed in the administrative segregation unit ("ASU").  As required by prison regulations, Plaintiff was provided a Form 114-D and a Form 1030 regarding the placement.  Dkt. No. 28-5 at 9-10; Rush Decl., ¶ 4 and Exs. A and B [Dkt. No. 28-4 at 2, 5-14].

The Form 114-D is an Administrative Segregation Unit Placement Notice.  It gives the incarcerated person notice of the reasons for placement in administrative segregation.  The Form 114-D was authored by defendant McBride and informed Plaintiff that he was being placed in administrative segregation because he presented an immediate threat to the safety of self or others, jeopardized the integrity of an investigation of alleged serious misconduct or criminal activity, and endangered institution security.  The Form 114-D listed the following circumstances which supported the placement:

> On Saturday, August 5th, 2017, you, inmate Hernandez, AH-1538 are being placed in Administrative Segregation (ASU). You are being placed in ASU pending an investigation based on confidential information indicating that you and other inmates are involved in a conspiracy to assault staff at Pelican Bay state prison PBSP. It is noted that as of now there are no specific staff members that have been identified as being targeted for assault. An investigation into your involvement is being conducted by Correctional Officer A Kaufman of PBS ISU. You will remain in ASU pending the outcome of this investigation. Due to the aforementioned information, your presence in the general population of Facility

3

A poses a threat to the safety and security of the Institution, its staff, and other inmates and Facility A.   You will remain in ASU pending the completion of a review by the Facility Captain and/or the Institutional Classification Committee for review of your appropriate housing and program needs.

Dkt. No. 28-4 at 8.

Prison regulations require that incarcerated persons be provided with a Form 1030, Confidential Information Disclosure Form, when confidential information is used to support placement in segregated housing.[4]  *See* Dkt. No. 28-4 at 5-6.  The Form 1030 requires prison officials to identify why the confidential information was considered reliable, and what the confidential information indicated.  The Form 1030 provided Plaintiff was authored by defendant Kaufman on August 2, 2017.[5]  The Form 1030 disclosed that information received from a confidential source had been considered in preparing the August 5, 2017 Form 114-D Order placing Plaintiff in segregated housing; and that the source was considered reliable because the source had "previously provided confidential information which proved to be true."  Dkt. No. 54-1 at 9, 50; Rush Decl., Ex. A [Dkt. No. 28-4 at 5-6].  The Form 1030 stated that the confidential information received indicated the following:

On Saturday, August 5, 2017 a decision was made to place you in the Administrative Segregation Unit (ASU).  Specifically A confidential informant indicated that a validated member of the Mexican Mafia (EME") has been ordering inmates on Facility A at PBSP to coordinate an assault on Correctional Staff with weapons.  [You have] been identified as one of the possible inmates who is coordinating and planning this assault.

Dkt. No. 54-1 at 50; Rush Decl., Ex. A [Dkt. No. 28-4 at 5-6].

Plaintiff states that Defendants placed him in ASU in retaliation for his July 2017 lawsuit; that the Form 1030 was a pretext to place him in ASU; that the confidential information never mentioned him, as proven by the later invalidation of the Form 1030; and that the Form 1030 falsely stated that the confidential information was reliable as Plaintiff was never named in the confidential information.

On August 7, 2017, Captain Parry reviewed the Form 114-D and approved retaining Plaintiff in ASU pending review of the placement by the Institutional Classification Committee

---

[4] A Form 1030 is also required when confidential information is used to support a disciplinary violation writeup or gang validation.  Dkt. No. 28-4 at 5-6.
[5] The Form 1030 spells defendant Kaufman's name as "Kauffman."  Dkt. No. 28-4 at 5.

United States District Court
Northern District of California

("ICC"), stating that the decision was because Plaintiff posed a threat to the general population. Dkt. No. 28-4 at 9-10. Plaintiff was transferred to ASU that same day and placed in the short term restricted housing in the ASU. Rush Decl., ¶ 6 and Ex. E [Dkt. No. 28-4 at 2, 12-14].

On or about August 10, 2017, as required by state regulations, a classification committee hearing was held to determine whether Plaintiff should be retained in ASU. The hearing was chaired by defendant Bradbury, and a recorder and licensed social worker were also present. Dkt. No. 28-4 at 16-17. Defendants Kaufman, McBride, and Lacy were not present at this hearing. Dkt. No. 28-5 at 12. At the hearing, Plaintiff was read the Form 1030 and was informed that, due to being identified in the Form 1030, he was considered a risk to the safety of the institution and would be retained in ASU for 90 days pending an investigation. Plaintiff challenged the retention in ASU. Plaintiff stated that the Form 1030 was unreliable because it lacked independent corroborating evidence, and failed to adequately identify how the information was obtained. Plaintiff stated the use of unreliable information violated state regulations and the federal Due Process clause. Plaintiff also stated that he found it peculiar that he was placed in ASU a few days after he requested an *in forma pauperis* form from the library. Dkt. No. 28-5 at 15; Dkt. No. 54-1 at 9. Defendant Bradbury's sole involvement in the relevant events was chairing this hearing, and Plaintiff did not have any interactions with defendant Bradbury outside of this hearing. Dkt. No. 28-5 at 28.

On September 12, 2017, due to overflow needs within the ASU, Plaintiff was moved within the ASU to Housing Area C 002 2, Facility C. While this housing area is identified as the Security Housing Unit ("SHU") in the Strategic Offender Management System ("SOMS"), it is the ASU and not SHU. Both the SHU and ASU are located in Facility C, but they are separated by security classification. Plaintiff was not placed in the SHU wing of Facility C at any point. During Plaintiff's time in Facility C, Plaintiff remained in the ASU wing until he was transferred away from PBSP on November 22, 2017. Rush Decl., ¶ 6 and Ex. E [Dkt. No. 28-4 at 2-3, 25-27]. Plaintiff states that this housing constituted an atypical and significant hardship because the security welfare checks conducted in this housing prevented him from sleeping, resulting in Plaintiff developing an irregular heartbeat, shortness of breath, and an inability to focus because of

the exhaustion due to the sleep deprivation.  Dkt. No. 54-1 at 10.

On or about September 27, 2017, the investigation into the allegations made in the confidential memorandum concluded with the finding that, while there was a genuine possibility of a conspiracy to assault staff, there was no evidence that Plaintiff was involved in the conspiracy.  The investigation concluded that the Form 1030 was therefore issued in error.

> [Plaintiff] was placed in ASU in 8/5/2017 pending an investigation into his involvement in a conspiracy to assault staff.  [Plaintiff] is being retained in ASU pending an investigation into his involvement in a Conspiracy to Assault Staff with a Deadly Weapon. . . . Correctional Officer A. Kauffman of PBSP ISU was assigned to conduct an investigation into [Plaintiff's] involvement in this conspiracy.  [Plaintiff] was issued a Confidential Memorandum Disclosure From in 8/5/2017 indicating that a confidential informant indicated that a validated member of the Mexican Mafia (EME) has been ordering inmates housed on Facility A at PBSP to coordinate an assault of correctional staff with weapons. [Plaintiff] has been identified as one of the possible inmates who was coordinating and planning this assault in a Confidential Memorandum dated 8/17/2017 (CDCR 1030 issued 10/24/2017).  The investigation was concluded on 9/27/2027, which determined while there was a genuine possibility there was a conspiracy to assault staff, there was no evidence to support charging [Plaintiff] with this activity.  Therefore his retention in ASU is no longer warranted due to the investigation.  A recommendation of the investigation is to transfer all involved inmates away from PBSP. . . .  A 08/02/2017 confidential memorandum and the associated CDCR 1030 that was issued to [Plaintiff] without the document being located in the Central File.  Upon further review of the referenced document, it has been determined that [Plaintiff] is not directly named in the Confidential Memorandum and the CDCR 1030 was issued in error.  Due to current technical limitation, the CDCR 1030 will remain in the file, but is invalid.

Dkt. No. 28-4 at 21; *see generally* Rush Decl., ¶ 4 and Ex. D [Dkt. No. 28-4 at 2, 18-24].  While the Form 1030 remained in Plaintiff's file, it was deemed invalid.  Rush Decl., ¶ 4 and Ex. D [Dkt. No. 28-4 at 2, 18-24].

On October 25, 2017, a classification hearing was held for Plaintiff.  Plaintiff was informed of the findings of the investigation, and that he would be transferred to another prison because his presence at PBSP created a threat to the general population.  Rush Decl., ¶ 4 and Ex. D [Dkt. No. 28-4 at 2, 18-24].  Plaintiff was transferred from PBSP to High Desert State Prison, with a short layover at San Quentin State Prison.  Rush Decl., ¶ 6 and Ex. E [Dkt. No. 28-4 at 2-3, 25-27].

## IV.    Defendant Lacy

On October 20, 2014, Plaintiff filed Grievance No. PBSP 14-02842, alleging that various correctional officers, including defendant Lacy, improperly searched his cell and that one of the

United States District Court
Northern District of California

officers, Sgt. Barneburg, planted a blade in his cell.[6]  Dkt. No. 28-6 at 9-12.  This grievance was denied at the third level on March 20, 2015.  Dkt. No. 28-6 at 7-8.  Plaintiff had no interactions with defendant Lacy after 2014 until September 1, 2017, when defendant Lacy conducted the first level interview of Grievance No. PBSP 17-01804.

On or about July 13, 2017, Plaintiff mailed *Hernandez I* to this court by handing the complaint and an *in forma pauperis* application to prison officials for mailing.  The cover sheet of the complaint was visible to the prison officials.  The cover sheet listed all the defendants, including defendant Lacy, and the *in forma pauperis* application was also accompanied by a copy of the cover sheet of the complaint.  Dkt. No. 28-5 at 22-24.  Plaintiff states that defendant Lacy likely learned of this lawsuit either by personally viewing Plaintiff's mail, or by being informed by other correctional officials who viewed the mailing: "if I'm giving another – a copy a request form with a complaint cover sheet with a lot of defendants, some of them that are probably his friends, it's not hard to imagine that they would've told him."  Dkt. No. 28-5 at 22-24.  Defendant Lacy states that he was unaware that *Hernandez I* was filed until served in this action.  Lacy Decl., ¶ 6.  Defendant Lacy denies being told about *Hernandez I* by other correctional officials.

On August 13, 2017, Plaintiff submitted Grievance No. PBSP-S-17-1804, which alleged that, per CDCR's unwritten policies and customs, Plaintiff was retaliated against for exercising protected conduct when, nearly three weeks after he filed a federal civil rights action, he was placed in ASU on August 5, 2017.  Plaintiff alleged that correctional officers had "nefariously . . . manipulated [confidential information] in order to incriminate [Plaintiff] falsely in an alleged conspiracy to attack staff;" and that he had been placed in ASU based on fabricated confidential information.  Dkt. No. 28-2 at 39-42.  Defendant Lacy was assigned as the first level interviewer for this grievance.  Dkt. No. 28-2 at 39; 43-45; Dkt. No. 28-5 at 21.

The parties disagree as to defendant Lacy's responsibilities and legal requirements when serving as the first level interviewer.  Plaintiff alleges that 15 Cal. Code Regs. § 3084.9(i)(B)(3) requires the assigned reviewer to interview the incarcerated person and as many witnesses as

---

[6] *Hernandez I* concerns the events raised in Grievance No. PBSP 14-02842.

United States District Court
Northern District of California

necessary to resolve the allegations. Dkt. No. 54-1 at 12-18, 35. Defendants state that first level interviewers are not required to conduct investigations and have no decision-making authority with respect to the grievance; and that first level interviews are only required to determine whether the information provided by the incarcerated person in the grievance is accurate and if the incarcerated person has further information to offer. Dkt. No. 28-3 at 2; Dkt. No. 57 at 6.

On September 1, 2017, defendant Lacy interviewed Plaintiff for the first level review of Grievance No. PBSP-S-17-1804. During this interview, Plaintiff asked defendant Lacy to investigate the Form 1030. Dkt. No. 28-5 at 22. Plaintiff states that defendant Lacy made no effort to investigate the claims that Plaintiff made during the interview, did not ask any questions relevant to Plaintiff's allegations, failed to identify the staff involved in the misconduct, and was not interested in anything Plaintiff had to say. Dkt. No. 54-1 at 10. Defendant Lacy recorded the interview with Plaintiff as follows:

> You state in part that on July 13, 2017 you filed a lawsuit against Pelican Bay State Prison Department Administration, supervisory staff and Correctional Officers for misconduct unrelated to this appeal. You further state that, on August 5, 2017, you were placed in administrative segregation unit (ASU) under particular circumstances, "pending an investigation," due to this department's unwritten policies procedures and customs. Also, that there has been a practice by supervising staff and administration up to and including the director of corrections allowing California Department of Corrections and Rehabilitation Officers to retaliate against prisoners for exercising a protected conduct. Also stating in part, that Officers have enacted a "witch" hunt to retaliate against you for filing a civil complaint against fellow officers. During the interview with you, you stated that the Confidential disclosure process was done incorrectly and that you believe there needs to be two independent sources to retain someone in ASU.

Dkt. No. 28-3 at 11. Grievance No. PBSP-S-17-1804 was subsequently denied.

Plaintiff had no further interactions with defendant Lacy. Dkt. No. 28-3 at 27.

## V.    CDCR's Administrative Grievance Process and Plaintiff's Grievances

### A.    CDCR's Administrative Grievance Process

During the relevant time period, the California Department of Corrections and Rehabilitation ("CDCR") provided incarcerated persons with an administrative grievance procedure to appeal prison policies, decisions, or actions that had a material adverse effect on their health. 15 Cal. Code Regs. § 3084.1(a) (repealed eff. Jun. 1, 2020); 15 Cal. Code Regs. § 3481

(eff. Jun. 1, 2020).[7]

If filing a grievance before June 1, 2020, the incarcerated person was required to follow the procedures set forth in 15 Cal. Code Regs. §§ 3084 *et seq.* (repealed eff. June 1, 2020). These procedures provided as follows. An incarcerated person initiated the grievance process by submitting a CDCR Form 602 at the first level. In the Form 602, the incarcerated person was required to describe the issue under appeal or the relief requested by stating all facts known and available to him regarding the issue being grieved, and listing all staff member(s) involved and each staff member's involvement in the issue. 15 Cal. Code Regs § 3084.2(a) (repealed eff. June 1, 2020). To exhaust available administrative remedies, the incarcerated person must proceed through three levels of review: (1) a first formal-level grievance filed with one of the institution's appeal coordinators, (2) a second formal-level appeal filed with the institution head or designee, and (3) a third formal-level appeal filed with the CDCR director or designee. 15 Cal. Code Regs. §§ 3084.2, 3084.7, 3984.8 (repealed eff. June 1, 2020). A decision at the third and final level satisfies the administrative remedies exhaustion requirement under 42 U.S.C. § 1997e(a). *Id.* at §§ 3084.1(b); 3084.7(c)(3) (repealed eff. June 1, 2020). Failure to pursue a grievance through the third and final level constitutes a failure to exhaust administrative remedies. *Id.* at § 3084.7(d)(3).

If filing a grievance after June 1, 2020, the incarcerated person was required to follow the procedures set forth in 15 Cal. Code Regs. §§ 3480 *et seq.* (eff. June 1, 2020). These procedures provided as follows. There are two levels of review for non-healthcare grievances, referred to as a grievance and an appeal. At the first level (the grievance level), the incarcerated person submits a CDCR Form 602-1 to the Institutional Office of Grievances at the prison where he is housed. *See id.* at § 3482(a), (c) (eff. June 1, 2020). In the Form 602-1, the incarcerated person is required to "describe all information known and available to the [incarcerated person] regarding the claim, including key dates and times, names and titles of all involved staff members (or a description of those staff members), and names and titles of all witnesses, to the best of the [incarcerated person's] knowledge." *Id.* at § 3842(c)(2) (eff. June 1, 2020). "In response, a claimant shall

_____

[7] The citations in this subsection are to the California Code of Regulations in effect at the relevant time period.

United States District Court
Northern District of California

receive a written decision" from the Institutional Office of Grievances "clearly explaining the reasoning for the Reviewing Authority's decision as to each claim." *Id.* at § 3481(a) (eff. June 1, 2020). This written decision, referred to as a first level decision, does not exhaust administrative remedies. *Id.* at § 3483(l) (eff. June 1, 2020). If an incarcerated person is dissatisfied with the first level decision, the incarcerated person may pursue second level review by appealing the decision to the second level. To file an appeal, the incarcerated person must submit a CDCR Form 602-2 to the CDCR's Office of Appeals in Sacramento within thirty days of receiving the first level decision. *Id.* at §§ 3481(a), 3485(a) (eff. June 1, 2020). If a remedy is granted or approved but not provided, an incarcerated person may use a CDCR Form 602-3 to request that prison officials implement that remedy. *Id.* at § 3486(k)(2) (eff. June 1, 2020). Completion of the review process by the Office of Appeals resulting in a decision of "denied," "granted," "no jurisdiction," "identified as staff misconduct," "pending legal matter," or "time expired" constitutes exhaustion of the administrative remedy process. *Id.* at § 3485(l) (eff. June 1, 2020).

### B.    Plaintiff's Grievances

Between August 2017 and June 2021, Plaintiff filed three relevant non-healthcare grievances that were appealed to the final level of review: Grievance Nos. PBSP-17-01804, PBSP-S-17-02119, and PBSP-17-02443.[8] None of these grievances named Defendants in the initial grievance.

**Grievance No. PBSP-17-01804.** On August 13, 2017, Plaintiff submitted Grievance No. PBSP-17-01804, alleging that he had been placed in ASU on August 5, 2017, in retaliation for filing a civil rights action on July 13, 2017. *See generally* Moseley Decl., ¶ 10 and Ex. D [Dkt.

---

[8] Defendants identify four other grievances filed between July 2017 and June 2021 that they believe may be relevant: PBSP-17-02780, HDSP-17-00290, OOA-17-16115, and HDSP-D-20-01791. The Court had reviewed these grievances and find that they do not raise the claims at issue in this action. Grievance No. PBSP-17-02780 alleges that Grievance No. PBSP-17-02967, regarding Guard One security welfare checks, was inappropriately cancelled for missing time constraints. Dkt. No. 28-2 at 71-104. Grievance No. HDSP-17-00290 alleges that Plaintiff was incorrectly transferred to High Desert State Prison because prison officials relied on a Form 1030 that had been invalidated. Dkt. No. 28-2 at 105-25. Grievance No. OOA-17-16115 alleges that Grievance No. PBSP-17-02780 was incorrectly cancelled. Dkt. No. 28-2 at 126-49. Grievance No. HDSP-D-20-01791challenges the UCC action placing Plaintiff on "close custody." Dkt. No. 28-2 at 150-172.

No. 28-2 at 36-51].  Plaintiff stated that PBSP had an unwritten policy of retaliating against

incarcerated persons who engaged in protected conduct:

> Specifically, confidential information is nefariously being manipulated in order to incriminate [Plaintiff] falsely in an alleged conspiracy to attack staff. However it should be noted that [Plaintiff]has not been issued an RVR for any wrongdoing and is simply being held in ASU based on fabricated confidential information.  Thus, because of this practice that the institution has endorsed, officers have disguised their retaliatory actions with an alleged investigation into a conspiracy.

Dkt. No. 28-2 at 39, 41.  The grievance does not identify any correctional official by name.  On

September 1, 2017, defendant Lacy interviewed Plaintiff with respect to this grievance.

According to Plaintiff, he asked defendant Lacy to investigate the Form 1030, but defendant Lacy

did not do so, did not ask any questions relevant to Plaintiff's allegations, failed to identify the

staff involved in the misconduct, and was not interested in anything Plaintiff had to say.  The first

level decision informed Plaintiff that the allegations of staff misconduct were being processed as a

staff complaint, and that the determination had been made that staff did not violate CDCR policy

with respect to the issues raised in this grievance.  Plaintiff appealed the first level decision.  He

stated that having defendant Lacy interview him regarding this grievance compromised the

integrity of the grievance process because Plaintiff had previously filed a staff complaint against

defendant Lacy for fabrication of evidence.  He further stated that defendant Lacy unreasonably

refused to investigate other similar cases that would have proven that CDCR has a practice of

retaliating against incarcerated persons who engage in protected conduct and of manipulating

confidential information as part of that retaliation.  The second level decision stated that the

grievance was now being processed as an appeal inquiry, that prison officials had completed a

review of the allegations of staff misconduct, that no witnesses were interviewed as a result of

Plaintiff's allegations, that prison officials had reviewed the August 5, 2017 Form 1030, and that

prison officials found that staff did not violate CDCR policy with respect to the issues being

grieved.  The second level decision also informed Plaintiff that he had not exhausted

administrative remedies with respect to any staff member not identified in the grievance, and that

if he were unable to name all involved staff, he could request assistance in establishing their

identity.  Plaintiff appealed the second level decision, stating that the decision failed to

acknowledge his allegation that defendant Lacy failed to properly investigate Plaintiff's claims

because he was biased against Plaintiff for previously filing a complaint against him; that if defendant Lacy had carried out the requested investigation, he would have come to the same conclusion as the ICC, which was that the confidential memorandum never mentioned Plaintiff's name and that the Form 1030 was issued in error; that defendant Kaufman and other department staff with knowledge of the alleged investigation had retaliated against him by fabricating confidential information to falsely incriminate him and by placing him in ASU; and that he had made every effort to identify the involved correctional officers, but that staff was refusing to help him.  This grievance was denied at the third level, with the finding that staff had not violated prison policies and that Plaintiff had added new issues and requests in his appeal which would not be considered.  *See generally* Moseley Decl., ¶ 10 and Ex. D [Dkt. No. 28-2 at 36-51].

**Grievance No. PBSP-S-17-02119.**  On September 5, 2017, Plaintiff submitted Grievance No. PBSP-S-17-02119, alleging that, on August 10, 2017, the Institutional Classification Committee ("ICC") improperly retained him in ASU.  Plaintiff stated that since an investigation was ongoing regarding the allegations that he posed a threat to staff, he should not be placed in ASU until the investigation was finished and it was determined that the allegations were viable. Plaintiff further stated that the ICC had violated his due process rights and prison regulations by retaining him in ASU based upon an unsubstantiated Form 1030 that lacked independent corroborating evidence.  Plaintiff requested release from ASU and that he not be retaliated against for filing this grievance.  The grievance bypassed the first level of review and was referred to the Classification Services Representative ("CSR") for audit and review.  The CSR reviewed the case on September 7, 2017, and approved Plaintiff's retention in ASU for ninety days pending completion of the investigation regarding Plaintiff's involvement in the charge of Conspiracy to Assault Staff with a Deadly Weapon.  At the second level of review, the decision granted Plaintiff's request that he not be retaliated against, but denied his request for release from ASU. The decision emphasized that placement in administrative segregation was appropriate where an incarcerated person's presence in the general population could jeopardize the integrity of an investigation of alleged serious misconduct.  The decision stated that upon completion of the investigation, the ICC would evaluate whether Plaintiff's case factors warranted retention in ASU

or release to an appropriate housing facility. Plaintiff appealed the second level decision, stating that it ignored the critical issue, which was that the ICC relied on confidential information that had not been corroborated or otherwise deemed reliable in the manner set forth in state and prison regulations. On January 30, 2018, prison officials denied this grievance at the third level. The third level decision stated that prison regulations required that, where an incarcerated person's placement in ASU is a disciplinary matter and likely to result in a rules violation report, the classification hearing is required to presume that the misconduct alleged in the Form 114-D is true; that the ICC could not consider evidence or information relating to the guilt or innocence of the incarcerated person; that Plaintiff did not meet the criteria for placement in non-disciplinary segregation; and that the Form 1030 met the criteria to be considered confidential, had reason of reliability, and disclosed sufficient information. Plaintiff did not identify any correctional officer by name in either the initial grievance or the appeal to the third level of review. Moseley Decl., ¶ 9 and Ex. C [Dkt. No. 28-2 at 11-35].

**Grievance No. PBSP-17-02443.** On October 3, 2017 Plaintiff submitted Grievance No. PBSP-17-02443, alleging that PBSP appeals officers Bramucci, Royal, and Sheldon compromised the investigation of PBSP-S-17-01804 when they improperly denied his request that he be assigned a different correctional officer to conduct the first level interview of PBSP-S-17-01804. Plaintiff stated that defendant Lacy's involvement in processing PBSP-S-17-01804 compromised the integrity of the grievance system, as indicated by defendant Lacy making no effort to investigate Plaintiff's retaliation claims, and refusing to add specific citations to PBSP-S-17-01804 that would have proven the nefarious use of confidential information and the retaliation. The first level decision denied this grievance, finding that staff had not violated CDCR policy. Plaintiff appealed, stating that Bramucci had engaged in misconduct by providing misleading information in an effort to discourage Plaintiff from pursing this complaint, and that Bramucci's supervisors, Royal and Sheldon, had failed to correct Bramucci's wrongdoing. The second level denied this grievance, again finding that staff had not violated CDCR policy. Plaintiff appealed the second level decision, stating that the second level decision rubber-stamped the first level decision, and alleging that Bramucci, Royal, and Sheldon had conspired with defendant Lacy to

1    compromise the integrity of the investigation into the retaliation complaint in order to cover up

2    PBSP's custom of retaliating against incarcerated persons who engaged in protected conduct.  *See*

3    *generally* Moseley Decl., ¶ 11 and Ex. E [Dkt. No. 28-2 at 52-69].

## DISCUSSION

5        Defendants argue that they are entitled to summary judgment for the following reasons.

6    First, they argue that Plaintiff failed to exhaust his administrative remedies against defendants

7    Bradbury, Kaufman, and McBride because he did not identify these defendants in any of the

8    grievances he filed regarding the relevant incidents.  Second, they argue that there is no genuine

9    issue of material as to whether defendant Lacy retaliated against Plaintiff because the record does

10    not reflect a retaliatory motive, his actions did not have a chilling effect, and his actions

11    reasonably advanced a legitimate penological goal.  Third, they argue that there is no genuine

12    issue of material fact as to whether defendants Bradbury, Kaufman, and McBride violated

13    Plaintiff's due process rights by placing him in ASU because they provided Plaintiff with notice of

14    the placement and gave him the chance to present his case, and the evidence supporting his

15    placement in ASU had indicia of reliability.  Finally, they argue that they are entitled to qualified

16    immunity.  *See* generally Dkt. Nos. 28, 57.  The Court addresses each of these arguments in turn.

## I.    Summary Judgment Legal Standard

18        Summary judgment is proper where the pleadings, discovery and affidavits show there is

19    "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

20    law."  *See* Fed. R. Civ. P. 56(a) (2014).  Material facts are those that may affect the outcome of the

21    case.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material

22    fact is genuine if the evidence is such that a reasonable jury could return a verdict for the

23    nonmoving party.  *See id.*

24        A court shall grant summary judgment "against a party who fails to make a showing

25    sufficient to establish the existence of an element essential to that party's case, and on which that

26    party will bear the burden of proof at trial [,] . . . since a complete failure of proof concerning an

27    essential element of the nonmoving party's case necessarily renders all other facts immaterial."

28    *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  The moving party bears the initial

United States District Court
Northern District of California

14

burden of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Id.* The burden then shifts to the nonmoving party to "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *See id.* at 324 (citing Fed. R. Civ. P. 56(e)). "A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact" precluding summary judgment." *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

For purposes of summary judgment, the court must view the evidence in the light most favorable to the non-moving party, drawing all justifiable inferences in that party's favor. *AXIS Reinsurance Co. v. Northrop Grumman Corp.*, 975 F.3d 840, 844 (9th Cir. 2020). If, as to any given material fact, evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the Court must assume the truth of the evidence set forth by the nonmoving party with respect to that material fact. *Furnace v. Sullivan*, 705 F.3d 1021, 1026 (9th Cir. 2013). However, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts. *Scott v. Harris*, 550 U.S. 372, 380 (2007). The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence. *Manley v. Rowley*, 847 F.3d 705, 711 (9th Cir. 2017).

## II.    Exhaustion of Administrative Remedies (Bradbury, Kaufman, and McBride)

### A.    Legal Standard

The Prison Litigation Reform Act ("PLRA") sets forth the requirement that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The PLRA's exhaustion requirement is mandatory. *Porter v. Nussle*, 534 U.S. 516, 524 (2002). All available remedies must be exhausted, and those remedies "need not meet federal standards, nor must they be 'plain, speedy, and effective.'" *Id.*; *see also Booth v. Churner*, 532 U.S. 731, 739-41 & n.5 (2001). Section 1997e(a) requires "proper exhaustion" of available administrative remedies. *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). Proper exhaustion requires the incarcerated person to

United States District Court
Northern District of California

1    use all steps of the administrative process and comply with "deadlines and other critical procedural

2    rules." *Id.* at 90.  Even when the incarcerated person seeks relief not available in grievance

3    proceedings, exhaustion is a prerequisite to suit.  *Booth*, 532 U.S. at 741.  If an incarcerated

4    person's grievance does not comply with a procedural rule but prison officials decide it on the

5    merits anyway at all available levels of administrative review, it is exhausted.  *Reyes v. Smith*, 810

6    F.3d 654, 656, 658 (9th Cir. 2016) (plaintiff's claim exhausted as to prison doctors named in

7    federal action where grievance plainly put prison officials on notice of the nature of the wrong

8    alleged in federal action – denial of pain medication by defendant doctors – and prison officials

9    easily identified the named prison doctors' involvement in the issue); *Wilkerson v. Wheeler*, 772

10    F.3d 834, 840 (9th Cir. 2014) (claim properly exhausted where inmate described nature of the

11    wrong and identified defendant as a responding officer who applied pressure to inmate's ankle

12    deliberately to inflict pain).

13         Compliance with prison grievance procedures is all that is required by the PLRA to

14    "properly exhaust." *Jones v. Bock*, 549 U.S. 199, 217-18 (2007).  The level of detail necessary in

15    a grievance to comply with the grievance procedures will vary from system to system and claim to

16    claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper

17    exhaustion.  *Id.* at 218.  Where a prison's grievance procedures do not specify the level of factual

18    specificity required in the grievance, "'a grievance suffices if it alerts the prison to the nature of

19    the wrong for which redress is sought.'"  *Griffin v. Arpaio*, 557 F.3d 1117, 1120 (9th Cir. 2009)

20    (quoting *Strong v. David*, 297 F.3d 646, 650 (7th Cir. 2002)).  The grievance need not include

21    legal terminology or legal theories unless they are necessary to provide notice of the harm being

22    grieved.  *Id.*  Nor must a grievance include every fact necessary to prove each element of an

23    eventual legal claim.  *Id.*  The purpose of a grievance is to alert the prison to a problem and

24    facilitate its resolution, not to lay groundwork for litigation.  *Id.*  The grievance should include

25    sufficient information "to allow prison officials to take appropriate responsive measures."

26    *Id.* (citation and internal quotation omitted) (no exhaustion where grievance complaining of upper

27    bunk assignment failed to allege, as the complaint did, that nurse had ordered lower bunk but

28    officials disregarded that order).

United States District Court
Northern District of California

Failure to exhaust under the PLRA is an affirmative defense that the defendant must plead and prove. *Jones*, 549 U.S. at 216. The defendant's burden is to prove that there was an available administrative remedy, and that the prisoner did not exhaust that available administrative remedy. *Albino v. Baca*, 747 F.3d 1162, 1172 (9th Cir. 2014). Once the defendant has carried that burden, the burden shifts to the incarcerated person to come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him. *Id.* That is, the burden shifts to the incarcerated person to come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him. *Id.* The ultimate burden of proof remains with the defendant. *Id.* If undisputed evidence viewed in the light most favorable to the incarcerated person shows a failure to exhaust, a defendant is entitled to summary judgment under Fed. R. Civ. P. 56. *Id.* at 1166. But if material facts are disputed, summary judgment should be denied, and the district judge rather than a jury should determine the facts in a preliminary proceeding. *Id.*

**B.      Analysis**

Defendants argue that Plaintiff did not exhaust his administrative remedies against defendants Bradbury, Kaufman, and McBride because prison regulations require incarcerated persons to identify the relevant correctional officers by name and, as Plaintiff acknowledged in his deposition, Plaintiff did not identify defendants Bradbury, Kaufman, or McBride in the relevant grievances. Defendants identify the relevant grievances as Grievance No. PBSP 17-02119, PBSP 17-02780, and Appeal Log 1805822. Dkt. No. 28 at 28-32; Dkt. No. 57 at 13-14. Plaintiff identifies Grievance No. PBSP 17-02119 as the relevant grievance, and argues that the procedural defect – failing to identify defendants Bradbury, Kaufman, and McBride – was excused when prison officials decided Grievance No. PBSP 17-02119 on the merits at all levels, citing to *Jones v. Bock*, 549 U.S. 199 (2007), and *Reyes v. Smith*, 810 F.3d 654 (9th Cir. 2016). Dkt. No. 54-1 at 26-29.

The Court finds that Grievance Nos. PBSP 17-01804 and PBSP 17-02119 exhausted Plaintiff's administrative remedies with respect to his due process claim that prison officials,

United States District Court
Northern District of California

1  including defendants Bradbury, Kaufman, and McBride, relied on confidential information that

2  they knew lacked indicia of reliability in order to place Plaintiff in administrative segregation.

3  These two grievances raised the crux of the due process claim in this action: the ASU placement

4  was based on unreliable confidential information. These two grievances gave sufficient notice to

5  prison officials that Plaintiff sought to hold accountable the prison officials involved in placing

6  him in ASU based on the Form 1030, thereby clearly identifying defendant Kaufman, who

7  authored for the Form 1030; defendant McBride, who authored the Form 114-D; and defendant

8  Bradbury, who retained Plaintiff in ASU at the ICC meeting. The two grievances were decided on

9  the merits at all levels.

10      Grievance No. PBSP 17-01804 challenged Plaintiff's August 5, 2017 placement in ASU,

11  alleging that the placement was in retaliation for filing a civil rights action in July 2017 and that

12  the manner of retaliation was fabricating confidential information to falsely implicate Plaintiff in

13  an alleged conspiracy to attack staff. While no correctional officers were identified by name in the

14  initial grievance, Plaintiff included with his grievance the August 2, 2017 Form 114-D authored

15  by defendant Kaufman, and the August 5, 2017 Form 114-D, authored by defendant McBride.

16  Dkt. No. 28-2 at 36-41. Grievance No. PBSP 17-01804 therefore gave prison officials notice of

17  the constitutional wrong alleged here: using confidential information that lacked indicia of

18  reliability, in violation of the Due Process Clause. Defendants Kaufman and McBride were easily

19  identifiable from the supporting documents that Plaintiff submitted with his grievance. And

20  defendant Kaufman was the correctional officer who informed Plaintiff of his ASU placement.

21  Because Grievance No. PBSP 17-01804 was decided on the merits at all levels of review,

22  Grievance No. PBSP 17-01804 exhausted the due process claim against defendants Kaufman and

23  McBride. *See Reyes*, 810 F.3d at 658-59.

24      Grievance No. PBSP 17-02119 challenged the August 10, 2017 ICC decision to retain

25  Plaintiff in ASU pending the outcome of the investigation, on the grounds that the ICC had

26  knowingly relied on confidential information that lacked indicia of reliability to support the

27  placement. While no correctional officers were identified by name in the initial grievance,

28  Plaintiff included with this grievance the ICC Chrono for the August 10, 2017 hearing, which

indicated that defendant Bradbury chaired the hearing. Dkt. No. 28-2 at 11-35. Grievance No. PBSP 17-02119 therefore gave prison officials notice of the constitutional wrong alleged here: using confidential information that lacked indicia of reliability to retain him in ASU, in violation of the Due Process Clause. Defendant Bradbury was easily identifiable from the supporting documents Plaintiff submitted and because defendant Bradbury chaired the ICC hearing that resulted in the decision challenged in this grievance. Because Grievance No. PBSP 17-01804 was decided on the merits at all levels of review, Grievance No. PBSP 17-02119 exhausted the due process claim against defendant Bradbury. *See Reyes*, 810 F.3d at 658-59.

The Court therefore DENIES Defendants' motion for summary judgment with respect to the claims against defendants Bradbury, McBride, and Kaufman on the grounds that Plaintiff failed to exhaust administrative remedies.

### III.     Retaliation Claim Against Defendant Lacy

#### A.     Legal Standard

"Within the prison context, a viable claim of First Amendment retaliation entails five basic elements:  (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005) (footnote omitted). The adverse action in the first element of a retaliation claim need not independently deprive the plaintiff (prisoner or not) of a constitutional right. *See, e.g., Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 283 (1977) (absence of right to continued employment does not defeat claim for retaliatory firing for First Amendment expression). Harm that "would chill a 'person of ordinary firmness' from complaining" is sufficient. *Shepard v. Quillen*, 840 F.3d 686, 691 (9th Cir. 2016) (quoting *Rhodes*, 408 F.3d at 569) (threat of placement in administrative segregation could constitute adverse action). The threat of harm alone, regardless of whether the threat is carried out, can be a sufficiently adverse action to support a retaliation claim. *Id.* at 688-89; *see also Brodheim v. Cry*, 584 F.3d 1262, 1269-70 (9th Cir. 2009) (threat of discipline or transfer to another prison, even if not carried out, was sufficient to support retaliation claim). The

second element, causation, requires showing that the prison official intended to take the adverse action out of "retaliatory animus" to "silence and to punish" the incarcerated person, as opposed to for some other reason. *Shephard*, 840 F.3d at 689-91 (finding genuine issue of material fact as to whether defendant sent incarcerated person to administrative segregation with intent to (1) follow 15 Cal. Code Regs. § 3335(a) or (2) retaliate for complaint about staff misconduct). Evidence probative of retaliatory animus includes proximity in time between the protected speech and the alleged adverse action. *See id.* at 690.

### B.    Analysis

Defendants argue that defendant Lacy is entitled to summary judgment with respect to the First Amendment retaliation claim for the following reasons. First, Defendants argue that defendant Lacy did not engage in any retaliatory act because, as the interviewer for the First Level Review, he was only required to determine whether the information provided by the incarcerated person in the grievance was accurate and whether the incarcerated person had additional information to provide; because defendant Lacy carried out his required duties as the First Level Interviewer; and because defendant Lacy was not required, legally or otherwise, to conduct the investigation requested by Plaintiff. Second, Defendants argue that Plaintiff has failed to demonstrate a triable issue of fact as to whether defendant Lacy's handling of the first level review was because of Plaintiff's protected conduct. Specifically, Defendants argue Plaintiff has not provided any evidence from which it can be reasonably inferred that defendant Lacy was aware of *Hernandez I* or was acting in retaliation for Grievance No. PBSP-14-02482. Third, Defendants argue that defendant Lacy's actions did not have a chilling effect because (1) although Plaintiff states that he worried that he would be validated as a gang member if he continued to file grievances, the alleged fear is contradicted by the fact that Plaintiff continued to file grievances after being interviewed by defendant Lacy; and (2) it is not reasonable to conclude that defendant Lacy's handling of the First Level Interview would chill or silence a person of ordinary firmness from future First Amendment activities. Finally, Defendants argue that defendant Lacy's actions reasonably advanced a legitimate penological goal because he conducted the interview in accordance with prison regulations. Dkt. No. 28 at 14-19; Dkt. No. 57 at 5-9.

20

United States District Court
Northern District of California

Plaintiff argues that the following evidence creates a triable issue of fact as to whether defendant Lacy retaliated against him.  In 2014, Plaintiff filed a staff complaint against defendant Lacy, Grievance No. PBSP-14-02482.  The fact that three years elapsed between filing Grievance No. PBSP-14-02482 and the 2017 first level interview does not mean that defendant Lacy had forgotten about the grievance.  In July 2017, Plaintiff filed a civil rights action, *Hernandez I*, that named as defendants various PBSP correctional officers, including defendant Lacy.  While Plaintiff does not have direct evidence that defendant Lacy knew of this complaint, defendant Lacy could have learned that he was named in *Hernandez I* because the cover of the complaint form listed Lacy as a defendant and was viewable by the correctional officials processing the mail who could have told defendant Lacy.  As the interviewer for Grievance No. PBSP-S-17-1804, defendant Lacy was required by state regulations to investigate Plaintiff's allegations, and defendant Lacy committed perjury by stating otherwise.  15 Cal. Code Regs. § 3084.9(i)(B)(3) provides that the assigned reviewer will interview the incarcerated person and as many witnesses as necessary to reach a determination concerning the allegations.  15 Cal. Code Regs. § 3084.9(i)(B)(3).  "Determination" means to decide or resolve a question.  Plaintiff asked defendant Lacy to assist him in identifying the correctional staff who prepared the false 1030 in retaliation for his civil rights complaint.  Defendant Lacy did not take any actions to investigate Plaintiff's grievance as evinced by the following.  The interview lasted no more than five minutes.  Defendant Lacy showed no concern regarding Plaintiff's allegations in the grievance.  Defendant Lacy did not ask relevant questions regarding Plaintiff's allegations.  Defendant Lacy did not show any interest in helping Plaintiff identify any staff members involved in the misconduct.  Defendant Lacy left as soon as Plaintiff stopped talking.  If defendant Lacy had properly investigated Plaintiff's allegations, defendant Lacy would have realized that the CDCR 1030 was defective.  Dkt. No. 54-1 at 12-18, 35.  Plaintiff further argues that there was a chilling effect in that "because of the retaliation he was subjected too (sic), he was living in fear of being validated as a gang member if he continued filing 602 appeals[,] . . . that he would spend the next decade in the 'SHU,' trying to get out, if he didn't stop complaining.  Given that 'PBSP' has a rich history of validating prisoners as gang members, wherein they would spend decades in the 'SHU' trying to

get out, Plaintiff's fear's are well-placed." Dkt. No. 54-1 at 16.

Viewing the record in the light most favorable to Plaintiff, the Court finds that there is no triable issue of material fact as to whether defendant Lacy took adverse action against Plaintiff, or as to whether defendant Lacy acted because of Plaintiff's protected conduct.

Defendant Lacy's interview complied with prison regulations, and therefore the interview was not adverse to Plaintiff.   Plaintiff's arguments are based on an incorrect understanding of defendant Lacy's obligations as a first level interviewer.  It is unclear whether Grievance No. PBSP 17-01804 was treated as a staff complaint or a regular grievance.  During the relevant time period, 15 Cal. Code Regs. § 3084.9(i) governed staff complaints, whereas 15 Cal. Code Regs. § 3084.7 governed regular grievances.  However, neither regulation required that the interviewer follow the incarcerated person's direction in investigating the allegations.  15 Cal. Code Regs. § 3084.9(i) only requires the assigned reviewer to "interview the appellant and as many witnesses as necessary to reach a determination concerning the allegation."  15 Cal. Code Regs. § 3084.9(i)(3)(B)3.  15 Cal. Code Regs. § 3084.7(e) requires a face-to-face interview.  15 Cal. Code Regs. § 3084.7(e) (repealed eff. Oct. 8, 2021).  Neither regulation required defendant Lacy to ask questions relevant to Plaintiff's allegations, to investigate Plaintiff's claims, to investigate similar cases that could show a pattern of retaliation by misusing confidential information, or to identify staff involved in Plaintiff's allegations.  To the extent that 15 Cal. Code Regs. § 3084.9(i) required the first level interviewer to interview "as many witnesses as necessary," the record does not support a finding that defendant Lacy should have interviewed additional people.  As discussed in further detail below, the confidential information provided was reliable, and the reliability was easily determined by reviewing the confidential memorandum.  No further interviews were needed to determine reliability.

Plaintiff has also failed to demonstrate a triable issue of material fact as to whether defendant Lacy was aware of *Hernandez I* and whether defendant Lacy acted in retaliation for Grievance No. PBSP-14-02482.  Plaintiff argues that the following circumstantial evidence raises a triable issue of material fact as to whether defendant Lacy was aware of *Hernandez I*.  First, the confidential memorandum was generated, and the ASU placement ordered, a couple weeks after

United States District Court
Northern District of California

Plaintiff filed *Hernandez I*.  Second, the fact that defendant Lacy was named in *Hernandez I* was easily knowable by prison officials as defendant Lacy was named in the complaint cover sheet and the cover sheet was visible to prison officials when Plaintiff handed it off for mailing.  Plaintiff further argues that the passage of time does not mean that defendant Lacy forgot about Grievance No. PBSP-14-02482.  However, because defendant Lacy's handling of the first level interview complied with prison regulations, the circumstantial evidence identified by Plaintiff is insufficient to create a triable issue of fact as to whether Plaintiff knew of, or acted because of, *Hernandez I* or Grievance No. PBSP-14-02482.  At most, the circumstantial evidence suggests a possibility of retaliatory motive.  However, at summary judgment, the non-moving party must provide more than a "scintilla of evidence."  *Addisu*, 198 F.3d at 1134.

The Court therefore GRANTS summary judgment in favor of defendant Lacy on the First Amendment retaliation claim.

## IV.    Due Process Claim Against Defendants Kaufman, Bradbury, and McBride

### A.    Legal Standard

In *Toussaint v. McCarthy*, the Ninth Circuit held that when prison officials initially determine whether an incarcerated person is to be segregated for administrative reasons, due process requires that they comply with the following procedures: (1) they must hold an informal non-adversarial hearing within a reasonable time after the incarcerated person is segregated, (2) the incarcerated person must be informed of the reasons segregation is being considered, and (3) the incarcerated person must be allowed to present his views.  *See Toussaint v. McCarthy*, 801 F.2d 1080, 1100 (9th Cir. 1986).  Due process does not require detailed written notice of charges, representation by counsel or counsel-substitute, an opportunity to present witnesses, a written decision describing the reasons for placing the prisoner in administrative segregation, or disclosure of the identity of any person providing information leading to placement of the incarcerated person in administrative segregation.  *See id.* at 1100-01; *accord Wilkinson v. Austin*, 545 U.S. 209, 228-29 (2005) (determining that prisoners are constitutionally entitled only to the informal, non-adversary procedures set forth in *Greenholtz v. Inmates of Neb. Penal and Corr. Complex*, 442 U.S. 1 (1979), and *Hewitt v. Helms*, 459 U.S. 460 (1983), prior to assignment to "supermax"

facility). Following placement in administrative segregation, prison officials must engage in some sort of periodic review of the incarcerated person's confinement. *See Hewitt*, 459 U.S. at 477 n.9; *Toussaint*, 801 F.2d at 1101. The Ninth Circuit requires that "some evidence" also support a decision to place an incarcerated person in segregation for administrative reasons. *See Toussaint*, 801 F.2d at 1104. In *Bruce v. Ylst*, 351 F.3d 1283 (9th Cir. 2003), the Ninth Circuit held that the "some evidence" supporting the gang validation resulting in administrative segregation in the SHU must have some "indicia of reliability." *See Bruce v. Ylst*, 351 F.3d 1283, 1287-88 (9th Cir. 2003).

### B.      Analysis

Defendants argue that they are entitled to summary judgment on the Due Process claims because defendant McBride gave Plaintiff adequate notice of the transfer; defendant Bradbury allowed Plaintiff to present his case; the Form 1030 and Form 114-D justified the ASU placement because the confidential information met the reliable evidence requirement; Plaintiff's placement in Housing Area C 002 2 of Facility C did not constitute an atypical or significant hardship because it was part of ASU, not SHU; the conditions in Housing Area C 002 2 were not a dramatic departure from Plaintiff's conditions of his confinement; and to the extent that the conditions in Housing Area C 002 2 caused Plaintiff to lose sleep, Plaintiff did not suffer any physical, emotional, or mental harm. Dkt. No. 28 at 19-24; Dkt. No. 57 at 9-12.

Plaintiff argues that Defendants violated the Due Process clause because the confidential information used was unreliable. Plaintiff proffers the following evidence in support of this claim. The confidential memorandum was generated shortly after he filed the civil rights action in July 2017. Plaintiff was not directly named in the confidential memorandum. After investigation, the Form 1030 was deemed invalid because there was no evidence to support the allegation that Plaintiff was involved the conspiracy to assault staff. The confidential memorandum did not comply with 15 Cal. Code Regs. § 3321(b)(1), which provides that no decision may be based upon information from a confidential source, unless the information is corroborated by another source or there is circumstantial evidence surrounding the event and the documented reliability of the source satisfies the decisionmaker that the information is true. The information provided in the

1    Form 1030 was lacking because there was no direct or circumstantial evidence corroborating the

2    confidential information.  Defendant Kaufman falsely represented the confidential information as

3    reliable, and defendants McBride and Bradbury failed to confirm the reliability of the confidential

4    information.  Dkt. No. 54-1 at 18-23.  Plaintiff further argues that the conditions in Facility C

5    Housing C 002 2 were a significant departure from standard administrative segregation conditions

6    such that they constituted an atypical and significant hardship because security welfare checks

7    were conducted every half hour that generated loud noises that prevented him from sleeping.  Dkt.

8    No. 54-1 at 21-23.

9        Viewing the record in the light most favorable to plaintiff, the Court finds that there is no

10   triable issue of material fact as to whether defendants Kaufman, McBride, and Bradbury violated

11   Plaintiff's due process rights.  Plaintiff does not dispute that he was given adequate notice of the

12   placement in ASU and an opportunity to present his case.  Dkt. No. 54-1 at 19.  And based on the

13   Court's review of the confidential memorandum, it is clear that that it concerned overall prison

14   security, and credibly explained that it was generated in response to recent attacks on staff.  The

15   information provided by the confidential informant had sufficient indicia of reliability.  The

16   confidential memorandum represented that the informant had previously provided reliable

17   information, and explained that staff investigated the information provided by the informant and

18   used it to gauge the informant's credibility.  Nothing in the record suggests that the representation

19   in the confidential memorandum that the informant had previously provided reliable information

20   was false.  While the confidential informant did not identify Plaintiff by name, the confidential

21   informant's description of the inmates involved reasonably implicated Plaintiff as potentially

22   involved in the conspiracy to attack staff.  And the timing of the incidents described in the

23   confidential memorandum rebuts any plausible claim that it was generated to support putting

24   Plaintiff in ASU in retaliation for his filing of a civil rights action in July 2017.

25       The Form 1030's later invalidation does not prove the unreliability of the confidential

26   information.  The Form 1030 was not invalidated because the confidential memorandum was

27   proven false, but because the investigation failed to uncover evidence supporting the confidential

28   memorandum's suggestion that Plaintiff was involved in a conspiracy to attack staff.  Indicia of

United States District Court
Northern District of California

1 reliability does not require that the information ultimately be proven true.

2       Because the confidential information relied upon to place Plaintiff in ASU had sufficient

3 indicia of reliability, there was no due process violation.  The Court GRANTS summary judgment

4 in favor of defendants Bradbury, McBride, and Kaufman on the due process claims.

5 **V.**    **Qualified Immunity**

6       Defendants argue that they are entitled to qualified immunity because it would not have

7 been clear to an official in defendant Lacy's position that how he handled the first level interview

8 of Grievance No. PBSP-17-01804 violated the First Amendment, and it would not have been clear

9 to defendants Bradbury, McBride, and Kaufman that their actions in placing Plaintiff in ASU

10 violated the Due Process Clause.  Dkt. No. 28 at 26-29.

11       The defense of qualified immunity protects "government officials . . . from liability for

12 civil damages insofar as their conduct does not violate clearly established statutory or

13 constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457

14 U.S. 800, 818 (1982).  In considering a claim of qualified immunity, the Court must determine

15 whether the plaintiff has alleged the deprivation of an actual constitutional right and whether such

16 right was clearly established such that it would be clear to a reasonable officer that his conduct

17 was unlawful in the situation he confronted.  *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

18 Courts are not required to address the two qualified immunity issues in any particular order, and

19 instead may "exercise their sound discretion in deciding which of the two prongs of the qualified

20 immunity analysis should be addressed first in light of the circumstances in the particular case at

21 hand."  *Id.* at 236.  Courts may "exercise their sound discretion in deciding which of the two

22 prongs of the qualified immunity analysis should be addressed first in light of the circumstances in

23 the particular case at hand."  *Id.* at 236.  Because there was no violation of Plaintiff's

24 constitutional rights, as explained above, there is no necessity for further inquiries concerning

25 qualified immunity.  *See County of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998) ("[T]he

26 better approach to resolving cases in which the defense of qualified immunity is raised is to

27 determine first whether the plaintiff has alleged the deprivation of a constitutional right at all.").

28 //

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

## CONCLUSION

For the reasons set forth below, the Court GRANTS Defendants' motion for summary judgment. Dkt. Nos. 28, 50. Judgment is entered in favor of Defendants and against Plaintiff. The Clerk shall terminate all pending motions as moot, and close the case.

This order terminates Dkt. Nos. 28, 50.

**IT IS SO ORDERED.**

Dated:    3/31/2025

HAYWOOD S. GILLIAM, JR.
United States District Judge